Filed 1/26/16  P. v. Robles CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARIO FLORES ROBLES,<br><br>    Defendant and Appellant. | F068542<br><br>(Fresno Super. Ct. No. F11905559)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Mario Flores Robles was convicted of the continuous sexual abuse of a child under the age of 14 years (Pen. Code, § 288.5, subd. (a)),[1] and sentenced to the midterm of 12 years in state prison. The victim was the 11-year-old daughter of defendant's girlfriend.

On appeal, defendant contends the court should have granted his second motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), which was made shortly before trial. He also contends the court should have granted his objections to the testimony of the prosecution's expert witness, who testified about child sexual abuse accommodation syndrome (CSAAS), because the witness allegedly vouched for the child's credibility. We affirm.

## FACTS

Defendant and his girlfriend, Angela, had an on-and-off relationship since 2002. However, defendant was a constant presence in the life of Angela's daughter, Desiree (born 2000), and Desiree called him "Dad."

In 2011, defendant, Angela, and Desiree lived together. Desiree was in fifth grade.

Angela testified that her relationship with defendant had been "very abusive" and he committed acts of domestic violence against her. She testified defendant would "just throw me around sometimes," "get up in my face and yell at me," and once had bitten the top of her eye. At one point in their relationship, Angela ran away from defendant, went to the Marjorie Mason Center for help, and obtained a restraining order. After these incidents, Angela reconciled with defendant because she loved him, and defendant always said he was sorry and it would not happen again. She testified that after she

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

obtained the temporary restraining order in 2004, there were additional incidents, but she never again reported defendant.

## Desiree's statements to her friend

Sometime in September 2011, Desiree was walking home from school with her girlfriend, A. Desiree was 11 years old. A. testified Desiree asked her whether she would ever get into a car with defendant. A. said she did not know. Desiree asked A. if she thought defendant was strong enough to hold someone down. A. again said she did not know. Desiree asked A. to promise not to repeat something, and A. made the promise.

Desiree told A. that she was asleep in her bedroom one night, and defendant was drunk. He went into her bedroom, grabbed her wrists, held her down, and "raped" her. Desiree did not explain exactly what he did, but A. believed she meant something sexual happened.

A. told her mother what Desiree said. Her mother was not sure whether to believe it because another girl at their school had falsely claimed that she had been "raped" to get attention. However, Desiree never told anyone other than A., and A. testified Desiree did not get the same type of attention.

A few weeks after their initial conversation, A. went to Desiree's house. A. testified defendant and Angela were fighting in the living room. They were very mad at each other. Angela tried to get up, defendant pulled Angela's hair, and he made her sit down. Desiree told A. they should go back to Desiree's bedroom. Desiree told A. that they were always arguing.

A. testified that when they were in Desiree's bedroom, Desiree "started petting the bed and she was telling me that that is where it happened and she started almost crying."

A. testified that after her visit to Desiree's home, they were together at school and Desiree said her stepbrother had been drunk, and "he also tried to rape her" with defendant. Desiree did not act upset when she said this.

A. later told another girlfriend what Desiree said about defendant. This girlfriend told a family member, who immediately contacted Desiree's school.

**Desiree's first statements to the police**

On Friday, September 23, 2011, officials at Desiree's elementary school learned about her statements to A. Officer Landon Vue, the school's assigned police officer, spoke to Desiree in the presence of a school official. Desiree was advised that there were allegations she had been abused and raped. Desiree seemed very uncomfortable. She said there was often yelling in the home, but she denied the rape allegations. The school officials contacted the police department and child protective services (CPS) for further investigation.

Later that Friday, Fresno Police Officer John Overstreet and a social worker from CPS arrived at the school. Overstreet interviewed Desiree in the presence of the social worker and asked about her statements to A. Overstreet described Desiree as intelligent, adjusted, and well-spoken. Desiree said that she told a friend she had been "raped" by her mother's "former" boyfriend. Desiree could not define the word "rape," but said the man touched her while she was sleeping. Desiree said she made up the story because she wanted to tell her friend something exciting.

Officer Overstreet asked Desiree what caused her to tell this story. Desiree said when she was between the first and second grades, one of her mother's former boyfriends entered her bedroom while she was asleep, knelt next to the bed, and touched her shoulder, upper chest, arms, and nongenital areas. Desiree believed he wanted to "rape" her. Overstreet explained the meaning of the word "rape" to Desiree. After hearing the definition, Desiree said the man never raped her. She told the man to stop, and the man mumbled something under his breath and left her bedroom. Desiree could not remember this man's name, when the incident occurred, or what happened. However, Desiree said it happened at the house where she was currently living.

Officer Overstreet noticed Desiree gave very specific answers when they spoke about general matters, but she became very vague when he asked her specific details about the alleged molestation. Overstreet believed Desiree had embellished a story for her friend and the report was inconclusive, but he also thought there was more to it.

**Desiree's statements to her mother**

After he interviewed Desiree, Officer Overstreet asked the school for information about the men who had been authorized to pick up Desiree from school. He was given four names. Overstreet called Angela, Desiree's mother, and told her about his interview with Desiree and the sexual molestation allegations. Overstreet asked Angela to identify the four men and whether they had been in contact with Desiree. Angela identified the four men as a former boyfriend, her former husband, Desiree's natural father, and defendant, who was Angela's current boyfriend.

Angela testified she was upset after talking to Officer Overstreet. She called defendant and told him the police said Desiree might have been sexually molested by one of her former boyfriends. She testified defendant picked up Desiree from school, and then defendant and Desiree picked up her from work, and they drove home together.

As defendant drove them home, Officer Overstreet again called Angela and asked her to talk to Desiree and make sure she understood what it meant to lie about something. Overstreet realized Angela was with Desiree, but he did not know defendant was also in the car. Overstreet asked Angela to clarify with Desiree if the alleged incident occurred at their current residence. Overstreet heard Desiree tell Angela that it happened when they lived in Clovis.

When they got home, Angela talked to Desiree in her bedroom; defendant stayed outside. She asked Desiree whether anyone had touched her, and that she needed to know what happened so she could fix it. Angela testified Desiree started to cry and said: " 'Dad comes to my room and he touches me,' " referring to defendant.

5.

Angela testified she did not ask Desiree for details because defendant was outside and she did not want him to hear their conversation. She testified she was very intimidated by defendant because of his past behavior toward her. Angela did not have access to defendant's cell phone, and she was scared to call the police. Angela arranged for Desiree to stay with Angela's former husband and his family for the weekend, and arranged for them to take her to school the following Monday. She wanted to get Desiree out of the house to be safe, so defendant would not "scare her" into saying something different. Angela told Desiree that when she went to school after the weekend, she should stay there and not return to defendant's house.

Angela's former husband picked up Desiree from defendant's house. Angela spent the rest of the weekend with defendant and pretended nothing was wrong.

**Desiree's second interview with the police**

On Monday, September 26, 2011, Angela's former husband took Desiree to school. Defendant drove Angela to work, and she immediately called Officer Overstreet. Angela was crying and upset, and explained Desiree revealed to her on Friday that defendant had molested her. Angela said she feared for Desiree's safety and had her stay with other family members over the weekend. She said Desiree was at school and asked Overstreet to interview Desiree again.

Officer Overstreet went to Desiree's school and interviewed her in the presence of a school official. Desiree was composed but more nervous. Overstreet asked Desiree why she was not forthright when they spoke the previous Friday. Desiree said she did not want her mother to be upset with her, and she did not want to say anything that would make her mother break up with defendant. However, Desiree said defendant had touched her breasts, buttocks, and vaginal area on approximately five different occasions. She did not say that it happened almost every night.

6.

Desiree said the first time was when she was in fourth grade.[2]  She was home from school with an earache and her mother was at work.  Desiree said she was watching television in her bedroom.  Defendant came in, climbed on top of her, and used one hand to hold both her hands about her head.  Defendant touched her breast, stomach, and pelvic area, directly on her skin.  Defendant used his other hand to remove their shorts.  Desiree said she struggled and pleaded with defendant to stop, but he straddled her with his knees to keep her still.  Defendant used both of his hands to hold her hands about her head.  Desiree said she felt defendant's penis touch her vaginal area but it did not penetrate.

**Defendant's postarrest interview**

After interviewing Desiree, Officer Overstreet called Angela, and advised her that he was going to arrest defendant and asked for his whereabouts.  Angela said defendant was at their house.  Overstreet and another officer went to the house and arrested defendant.

While they were still at the house, Officer Overstreet advised defendant of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and defendant agreed to answer questions.  Overstreet told defendant about the allegations against him.  Defendant said "he had nothing to do with any kind of a sexual assault.  Overstreet told defendant that he knew he was not being truthful.  Defendant said "there may have been a time when he was wrestling with [Desiree] but it was purely play, and if there was any touching, it was accidental."

Officer Overstreet again advised defendant that he was not being truthful, and the victim had provided specific information about his conduct.  Defendant "shrugged his shoulders and looked down."  Overstreet asked defendant if he was sorry for what

---

[2] Angela testified Desiree stayed home from school for three days with an ear infection.  Angela was at work and defendant stayed home with her.  Angela believed this occurred within a few weeks of Desiree's report.

happened. Overstreet testified defendant nodded his head up and down, and said, "Yes, I'm sorry." Overstreet asked defendant why he was sorry. Defendant said "there was an incident" the previous week when he went into Desiree's bedroom to turn off the television at night. Defendant said he laid next to Desiree in bed, and "he touched her breasts and stomach and vaginal area skin to skin."

Officer Overstreet told defendant that he believed more happened. Overstreet testified defendant said there was an incident where he was lying on his back in his boxer shorts, and had an erection. Defendant claimed Desiree jumped on him and straddled his body. Defendant said maybe his penis came out of his boxer shorts and touched her vaginal area.

Defendant told Officer Overstreet there were other occasions when he touched Desiree's breasts, buttocks, or vaginal areas. He emphasized the incidents never lasted very long. Defendant said he was afraid to go to jail because other inmates would hurt him if they knew he molested a child.

After the interview, defendant asked Officer Overstreet to retrieve his wallet from his bedroom before he was taken to jail. Overstreet walked through the house and discovered a very large jar of marijuana in one room. He went into the master bedroom, and found a pornographic video was being played on the television. Overstreet found other pornographic magazines and videos in the bedroom.

Defendant was booked into jail. Officer Overstreet obtained an emergency protective order for Angela and Desiree. After defendant was arrested, Angela and Desiree lived with Angela's former husband for about one year.

**Desiree's physical examination**

Detective Gomez testified that on September 27, 2011, he spoke to Angela because she wanted to take Desiree to the hospital for an examination since Desiree said defendant had sex with her.

Detective Gomez testified he spoke with Desiree for about one minute to determine if he should authorize a sexual assault examination. Gomez knew that Desiree told Officer Overstreet that there was no sexual penetration. Gomez asked Desiree if "his private part went into your private part," and she said yes and it was painful. She also said there was bleeding, but seemed to indicate that was her condition at the moment of their conversation. Gomez authorized the examination.

Later that same day, Desiree had a forensic medical examination and told the nurse that defendant molested her five times, and the last time was two weeks earlier. Desiree said defendant touched her genital area and anus with his penis and his finger; there was either contact or penetration; it hurt; and he ejaculated. He never threatened her, and he did not commit any acts of oral copulation.

Desiree's physical examination was normal with no apparent injuries on her body, and the nurse could not confirm whether she had been sexually abused.

**Desiree's MDIC interview**

On September 28, 2011, Desiree was interviewed at the Multi-Disciplinary Interview Center (MDIC), and the videotape was played for the jury. Desiree said defendant touched her three to five times and described three incidents in detail. The first time was in December 2010, when Desiree was asleep in her bedroom. Defendant touched her waist and Desiree woke up. Desiree asked what he was doing, and he told her to be quiet. Defendant reached under her blanket and touched her vaginal area over her clothes. Desiree told him to stop, and defendant left the room.

Desiree described another incident which occurred when she was asleep in her mother's bedroom. Defendant grabbed her arm, pulled her on top of him, and their stomachs were touching. Defendant touched her chest and private parts with his hands.

Desiree said the last incident occurred two weeks earlier, when she was home from school with an ear infection. Desiree said defendant came into her bedroom while she was watching television. He placed his hand around her waist and stomach, and

9.

climbed on top of her on the bed. Defendant held down her hands and pulled down her pants. Defendant moved his body up and down, and Desiree felt his penis. Desiree felt uncomfortable and hit defendant's groin with her knee. He ran from the bedroom. The interviewer tried to clarify whether defendant's private part went into her private part. Desiree said she was not sure. Desiree never described an act of sexual intercourse.

Desiree said defendant said not to tell anyone what happened. He also said, "[I]f you ever did that to me, I wouldn't have told anybody."

Desiree did not say that defendant did something bad almost every night, that defendant was drunk, or that her stepbrother did something bad to her.

**<u>Defendant's second statement</u>**

On September 28, 2011, Detective Gomez conducted a tape-recorded interview with defendant in jail. Defendant denied any inappropriate sexual conduct with Desiree. Defendant was advised about his prior statements to Officer Overstreet. Defendant said Overstreet kept arguing with him, accused him of being a liar, and wrote down what he wanted to.

Defendant said Desiree could be out of control, and he was a tough disciplinarian. He caught Desiree engaging in sexual play with his nephews. Defendant said he was a "sexual" person, he watched pornographic videos, and regularly smoked marijuana. He had recently joined a church and was going to throw out the pornographic videos and reduce his marijuana use.

Defendant said Desiree fabricated the allegations against him because he was strict with her. Desiree wanted him out of the house so she could do whatever she wanted without consequences. Defendant claimed he only hugged or comforted Desiree when she was scared, and if she perceived something as inappropriate it could have been an accident. Defendant also claimed Desiree wanted to be a teenager and have a boyfriend.

Detective Gomez told defendant that Desiree claimed he touched her vaginal and breast areas. Defendant said "maybe messing around … we wrestle a lot we're

10.

consistently fighting each other," and denied anything happened in her bedroom. Upon further questioning, defendant said Desiree had "climbed over me many a time in the bed" while he was wearing his boxer shorts.

Detective Gomez advised defendant that a physical examination of Desiree could reveal evidence of sexual molestation. Defendant suggested that Desiree could have "messed around" with someone else.

Defendant was asked about the incident he previously described to Officer Overstreet, when he said Desiree climbed on top of him. Defendant said Desiree moved her body on top of him and tried to replicate a sexual act. The incident was very brief and ended when he pushed her away. Defendant said it would have been an accident if she was on top of him and she felt something on his body.

On further questioning, defendant said admitted he had an erect penis and "[m]aybe" the incident excited him. Defendant said Desiree wore thin tank tops that "pretty much" exposed her chest. Defendant said he never touched Desiree's chest or vagina in a sexual way. He admitted it was "possible" he touched her breasts. Defendant also admitted he became "aroused" when Desiree jumped on top of him, and "[m]aybe" he went over the line in the excitement.

Detective Gomez reminded defendant about what it was like when he was a teenager and acting in the heat of the moment, and didn't think about things right. Gomez asked, "Is this the same thing that happened?" Defendant replied, "It's probably something like that you know."

"[Q]. Was this (inaudible) sexual gratification for her or was it for you?

"[A]. I wouldn't really gratify I'm like a satisfaction.

"[Q]. Well you got be gratified….

"[A]. But I mean yeah I mean got me excited (inaudible)….

"[Q]. I, I mean you didn't climax or anything like that.

11.

"[A]. No but I mean I didn't want obviously come on I wouldn't want it to go there that would be going….

"[Q]. But you would have stopped her right away right? [Am] I right or I'm wrong?

"[A]. Yes.

"[Q]. But that didn't happen?

"[A]. Well we did stop right away."

Defendant said they stopped after about a minute, but it should not have been "even a second." Defendant said he touched one breast because it fell out of her tank top. Defendant said his hands may have gone outside her underwear. Defendant said it would not happen again. Detective Gomez asked defendant if he was a sex addict. Defendant said yes, and he was going to church to control his lifestyle.

Detective Gomez told defendant that he believed something sexual happened with Desiree, and asked if that was "a true statement." Defendant said, "Yeah, right, yes." Gomez asked defendant how he would apologize to Desiree. Defendant said, "Tell her I'm very sorry for doing anything wrong to you … very sorry."

**Angela's further statements**

On October 12, 2011, Detective Gomez interviewed Angela. Angela said defendant became angry if she did not go along with what he said, and she was "submissive" to defendant because she did not want him to get angry. She never said defendant was violent with her.

Angela said defendant was a heavy marijuana smoker and smoked every day. She also said he had a pornography collection and showed where it was kept. Angela said defendant always kept control of his cell phone and she could not use it. The night before he was arrested, however, she was able to look through it and discovered defendant had been using an adult dating service.

12.

**Desiree's trial testimony**

At trial, Desiree testified the first time defendant touched her was in December 2010, when she was in the fourth grade. It happened at night while she was sleeping in her bedroom. Desiree felt a hand against her side, woke up, and saw defendant. He touched her vagina and buttocks. Desiree told him to stop, and he mumbled and left the room.

Desiree did not tell her mother because she was afraid and thought her mother would not believe her. Desiree testified defendant touched her this way almost every night before she went to sleep. He would enter her bedroom, turn off her television, and touch her private parts. She would tell him to stop, and he would.

Desiree testified in mid-September 2011, she was home from school with an earache. Defendant woke her up, and told her to go into her mother's bedroom. Desiree stayed in her own bed. Defendant climbed on top of her and grabbed her wrists. He straddled her body with his knees and touched her stomach over her clothes. Desiree tried to get defendant off her by raising her leg. Desiree told defendant to stop, and he again mumbled something as he left the room.

Desiree testified about another incident which happened afterwards. Desiree was sleeping in her room. Defendant went into her bedroom, turned off the television, and laid next to her in bed. Defendant got on top of Desiree, grabbed her wrists with one hand, and held them above her head. Defendant pulled down both their boxer shorts with his other hand. Desiree testified she felt defendant's penis touch the skin of her vagina.

Also at trial, Desiree testified for the first time about additional incidents. Defendant once touched her buttocks as he walked by her in the living room, and it felt sexual. He frequently touched her buttocks in a way which made her feel uncomfortable.

Desiree described another incident which occurred around the time of the earache incident. Desiree was sleeping in her mother's bedroom when defendant entered. He

13.

laid down next to her and touched her buttocks. Defendant grabbed Desiree and pulled her on top of him.

Desiree also described an incident where she was in her mother's room and defendant entered. The television was on, and defendant told her to look. Desiree looked and saw naked people being sexual with each other. Defendant later went to his dresser and asked her to try on thong underwear, and she refused.

Desiree testified she told her friend, A., about the molestations because A. wanted to come over to her house. Desiree testified she was afraid something would happen and wanted to warn A. Desiree told A. that defendant "touched" and "raped" her. Desiree testified she did not know the correct definition of "rape," but knew it had a sexual meaning, "[l]ike forcing someone else to have sex and having sex." Desiree testified she made A. promise not to tell anyone.

Desiree testified she later talked to A. about the molestations when they were in Desiree's bedroom. A. asked what happened. Desiree told her that defendant went into her bedroom every night, turned off the television, and touched her. Desiree testified A. saw defendant and her mother fighting that day, and defendant pulled her mother's hair.

Desiree testified she spoke to an officer at her school. She did not initially tell him about the sexual incidents because she did not want the officer to know. Desiree also thought defendant might have stopped touching her for good. Desiree did not know if her mother would leave defendant. Desiree was afraid her mother and defendant would separate, and she loved defendant "like a dad." Desiree was also afraid her mother might not believe her and leave her.

Desiree testified that defendant picked her up from school on Friday, September 23, 2011, after she was initially interviewed by Officer Overstreet. Defendant drove to Angela's workplace to pick her up. During the drive, defendant told Desiree: "If you would have done this to me, I wouldn't have told anyone."

Desiree testified she never accused any of her stepbrothers of touching her.

14.

**Expert testimony**

Dr. Randall Robinson, a licensed psychologist, testified as a prosecution expert about Child Sexual Abuse Accommodation Syndrome (CSAAS). Dr. Robinson had not read any of the police reports about the investigation, and had not interviewed any of the parties. Dr. Robinson testified CSAAS is a descriptive rather than a diagnostic tool. It helps jurors understand misconceptions about child sexual abuse victims, such as the child's delayed disclosure, inability to understand what happened or recollect when it happened, failure to fight back against an abuser, particularly a relative, and fear of breaking up the family.

Dr. Robinson explained it was very important that the person who interviews the child not ask leading questions "because children want to give answers that will please the interrogator. But a child then feels further overwhelmed. And sometimes children retract their report because they are just being retraumatized by the whole process of trying to talk about something that they don't even understand."

Dr. Robinson testified children will be more likely to disclose to someone they trust, such as a friend or parent with whom they feel safe. It would be very significant if the alleged suspect had a lengthy romantic relationship with the child's mother because the child would essentially consider the abuser as a father and be reluctant to disclose to the mother.

Dr. Robinson testified that, in her experience, victims of sexual abuse typically still love their abusers. In addition, children naturally and instinctively strive to preserve the family unit.[3]

---

[3] We will address the entirety of Dr. Robinson's testimony in issue II, *post*.

## DEFENSE EVIDENCE

Defense counsel impeached Desiree and Angela with their prior inconsistent statements about the investigation and Desiree's allegations.

On cross-examination, Desiree testified it was possible one of her stepbrothers molested her, but she could not remember. Desiree was impeached about the number of times defendant molested her, and whether she fabricated the allegations to please her mother and help her leave defendant.

Wanda Yarbrough, a social worker with CPS, testified she went to defendant's house on Friday, September 23, 2011, the first day of the sexual molestation report. Yarbrough arrived sometime between 2:00 p.m. and 3:00 p.m. Defendant was home alone. Desiree arrived at the house about 15 to 20 minutes later. She walked in through the front door and was by herself. Desiree said hello and went into the back of the house. Yarbrough left the house without ever seeing Angela.[4]

Lisa Biggs, an investigator for the district attorney's office, testified she met with Desiree just before the trial to review her prior statements. Biggs asked Desiree for clarification about defendant's statements in the car. Desiree told Biggs that defendant picked her up from school on the day she first talked to the police about the molestation, which was on Friday, September 23, 2011. Desiree and defendant were alone in the car, and defendant "told her that he was surprised that she told and that if he had done something like that to her, he would not have told." Desiree said they picked up her mother and drove to their house.

James Lutter, the police department's digital forensic examiner, testified he examined memory cards seized from defendant's house and did not find any images of child pornography or nudity on them.

---

[4] The defense relied on this evidence to impeach Desiree's claim that defendant drove her home from school that day, and made inculpatory statements to her while they were in the car.

16.

Several members of defendant's family testified to impeach Desiree's credibility. Laura Cota, defendant's mother, testified that about one week after defendant was arrested, she went to Angela's house to see if Desiree was okay. Cota testified she heard Desiree tell her brother, Harvey, " 'I can do what I want now.' " Cota did not tell anyone about the conversation "[b]ecause I wasn't sure what it meant." She told defendant's public defender about the conversation about a month before the trial.

Luis Flores Robles III, defendant's brother, testified that his family started monitoring Desiree's Facebook page after defendant was arrested. He gained access through his niece's Facebook page. Robles testified there was a comment on Desiree's Facebook page that "she felt bad about something that she did wrong to somebody and she felt bad about it," and "she blamed somebody for something that was wrong and she felt bad." There was a comment below that post from one of Desiree's brothers, telling her to "shut the f[**]k up." Robles testified the post was removed before he was able to save it. He tried to print the page, but it was not legible and he discarded it.

On cross-examination, Robles admitted defendant sent him letters from jail, stating that he would be getting a lot of money once he was released, and he planned on sharing the money with his family.

Veronica Frias, defendant's sister, testified she saw Angela and defendant on the weekend of September 23 to 26, 2011, at various family gatherings. She did not see Desiree. Angela appeared happy and affectionate with defendant. At one point, however, Angela was upset when defendant was hanging out with a friend and apparently smoking marijuana.

Tanisha Robles, defendant's daughter, testified she used to live with defendant, Angela, and Desiree. She was no longer living there when defendant was arrested. Tanisha testified she spoke with Desiree on September 26, 2011, after defendant was arrested. Tanisha testified they had an emotional conversation and were crying. Desiree said defendant molested her and gave different versions about what happened. Desiree

17.

first said that defendant molested her for a year while Tanisha lived with them. Desiree also said it happened after Tanisha moved out. Desiree said defendant "raped" her when she was home with an earache. Desiree said defendant "went into her room and that he bent her over the bed and that he raped her. And the second story she said was that she was asleep and [he] took her clothes off and raped her." Desiree never told Tanisha about it because she was scared.

### *Defendant's letter to Tanisha*

On cross-examination, Tanisha testified she received a letter from defendant in the summer of 2013. Defendant was in jail and wrote that the letter was being delivered via a friend because otherwise the jail would read his mail. Defendant asked Tanisha if she had been in contact with Desiree and Angela. Defendant wrote that he would be " 'getting into a whole lot of money,' " Tanisha and her siblings would be " 'able to have everything you want,' " he would buy them houses, and it wasn't a joke " 'to get you to do what I want.' "

Defendant then wrote: " 'I need you to talk to [Desiree] and tell her that if she says she lied about this, she and her mother [Angela] will be able to have whatever they want,' " " '[s]he needs to know that her mom won't have to work any more,' " and " 'they need to know I have a lot of stuff, too, and this as it is.' " Defendant added: " 'But if she says that it was all a lie, I will be able to get so much more money.' " Defendant asked Tanisha to ask Angela " 'if they plan on showing up to trial.' " Defendant wrote that he would not " 'hold back' " at trial, and he had information that Desiree said " 'she lied about all of this.' "

Tanisha testified defendant wrote that he was " 'looking at millions,' " and if Desiree " 'does this, it would be in the high millions.' " Defendant told Tanisha to tell Desiree that she would not have to appear in court, and she could just let his investigator record her statement on videotape. Defendant said he hoped Tanisha would talk to Desiree and " 'don't forget to ask [Angela] about the showing up to trial.' " He ordered

18.

Tanisha to talk to Desiree " 'ASAP,' " and keep everything " 'low key' " when she wrote back to tell him about Desiree and Angela, and not use their names. He also directed her tear up the letter after she read it.

## REBUTTAL

Desiree testified she had a Facebook account but she never posted anything about this case or the molestations. Harvey, her 17-year-old brother, may have posted something like, "[s]tay strong."

Harvey and Carlos, Desiree's 23-year-old brother, testified Desiree never talked with them about the molestation. Harvey could not recall that Desiree posted anything about the incident on Facebook. Harvey told Desiree to "[s]tay strong, Sis" when she was in court.[5]

## Verdict and sentence

The amended information charged defendant with count I, continuous sexual abuse of a child under the age of 14 years with whom he resided, on or about August 1, 2010 through September 20, 2011; count II, commission of a lewd or lascivious act on a child under the age of 14 years, on or about August 1, 2010, through January 1, 2011 (§ 288, subd. (a)); and count III, commission of a lewd or lascivious act on a child under the age of 14 years, on or about September 1 through 20, 2011.[6]

After a jury trial, he was convicted of count I, and found not guilty of counts II and III. He was sentenced to the middle term of 12 years.

---

[5] Harvey was impeached with his arrest for vandalism in 2010. Carlos had a prior juvenile adjudication for burglary and was placed on probation.

[6] The amended information alleged defendant committed three or more acts of substantial sexual conduct within the meaning of section 1203.066, subdivision (b). The court found insufficient evidence to support that allegation and ordered it stricken before the case went to the jury.

19.

## DISCUSSION

### I.    Denial of Defendant's Second *Faretta* Motion

A few months after he was arrested, defendant made his first request, pursuant to *Faretta*, to represent himself. The court granted the request and relieved the public defender's office. About six months later, just before the scheduled preliminary hearing, defendant requested relief from his pro. per. status and reappointment of counsel. The court again appointed the public defender's office to represent him. Just before the scheduled start of his trial, as the "time-out" date was approaching, defendant made his second *Faretta* motion and again requested to represent himself. The court denied the motion.

Defendant contends the court abused its discretion when it denied his second *Faretta* motion and the error is reversible per se. The People reply that the motion was untimely because it was made just before trial, and the court did not abuse its discretion.

#### A.  *Faretta*

A criminal defendant has a right to represent himself or herself at trial under the Sixth Amendment to the United States Constitution. (*Faretta, supra,* 422 U.S. at pp. 835–836; *People v. Williams* (2013) 58 Cal.4th 197, 252.) " 'A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request unequivocally. [Citations.] Third, he must make his request within a reasonable time before trial. [Citations.]' [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 931–932.)

The erroneous denial of a timely *Faretta* request is reversible per se. (*People v. Williams, supra,* 58 Cal.4th at p. 253; *People v. Butler* (2009) 47 Cal.4th 814, 824.) However, "[w]hen a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's

20.

discretion. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1365.) We review the denial of an untimely *Faretta* motion for an abuse of discretion. (*People v. Jackson* (2009) 45 Cal.4th 662, 689–690.)

The question in this case is whether defendant's second Faretta motion was "timely." We turn to the procedural history of this case.

## B. Defendant's First *Marsden*[7] and *Faretta* Motions

On September 29, 2011, the court appointed the public defender's office to represent defendant.

On February 28, 2012, the court convened the pre-preliminary hearing. Defendant made a *Marsden* motion for appointment of another attorney. The court heard and denied the *Marsden* motion.

Immediately after the court denied the *Marsden* motion, defendant made an oral motion to represent himself pursuant to *Faretta*. At that time, he completed a written form requesting to represent himself, and wrote that he could "get more done for myself. This is my life at stake. I'm willing to learn what it takes." Defendant also moved for a continuance.

The court granted defendant's *Faretta* motion. Defendant entered a general time waiver, and the pre-preliminary hearing was set for March 20, 2012.[8]

From March to June 2012, the court granted continuances to both the prosecutor and defendant. As of June 29, 2012, the pre-preliminary hearing was scheduled for August 1, 2012.

---

[7] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[8] The instant appellate record does not include the reporter's transcript for the *Marsden* and *Faretta* motions of February 28, 2012.

21.

### C. <u>Reappointment of Counsel</u>

On August 1, 2012, the court convened the pre-preliminary hearing. According to the minute order, defendant requested to be relieved of his pro. per. status. The court granted the motion and reappointed the public defender's office to represent him. Defendant again entered a general time waiver.

On August 7, 2012, defendant appeared with Mr. Lambe of the public defender's office, who waived the preliminary hearing.[9] Defendant was held to answer. His general time waiver was still in effect.

### D. <u>Second *Faretta* Motion</u>

On May 30, 2013, defendant waived time to September 24, 2013, plus 15 days. The court set the settlement conference for September 19, 2013, with a tentative trial date of September 24, 2013.

On September 19, 2013, the parties appeared for the scheduled settlement conference. The trial was set to begin on September 24, 2013. Defendant was present with Mr. Lambe. The lead prosecutor was not present, and another deputy district attorney appeared for him.

The court stated that defendant had filed another *Faretta* motion to represent himself and completed a written advisement and waiver of right to counsel. The court asked defendant if he read and understood everything on the form. Defendant said yes.

The court advised defendant that his trial was scheduled to begin September 24, 2013, and asked if he was ready to proceed to trial. Defendant replied, "I'll *probably need a couple more months*." (Italics added.) The court said: "That could be a problem," and discussed the matter with the parties off the record.

---

[9] As will be explained below, Mr. Lambe said he waived the preliminary hearing to avoid any testimony that would have supported filing additional and more serious charges against defendant.

The court returned to the record, and noted defendant's first *Faretta* motion was granted in 2012, he represented himself for a period of time, and then he requested re-appointment of counsel. The court asked defendant if he wanted to add anything to his form pleadings. Defense counsel interrupted:

> "[DEFENSE COUNSEL]: Your Honor, before he answers that question, I'm thinking—I think it would be useful to him if he had the benefit of the Court's –what the Court's thinking is on that, and I can share that with him."

The court agreed, and defense counsel conferred with defendant off the record.

> Defense counsel then advised the court that defendant wanted to make a statement.

> "THE DEFENDANT: I plan on moving forward, Your Honor. It's my life I'm fighting for. I feel I have the right to continue fighting on my own. I've been pushed off for seven months already. Started back on February 14th all the way to now. *So I feel I should be allowed to have a couple more months and continue this on my own.*" (Italics added.)

The court stated that defendant's time waiver was in effect until September 24, 2013, "plus 15 court days beyond that within which the trial would begin."

Defense counsel said he had talked to the lead prosecutor before the hearing, and he stipulated the "time-out" date was October 25, 2013. Defense counsel further stated the lead prosecutor "was agreeable to an October 3 trial date but wanted an additional time waiver. But I left a message for him that he hasn't had a chance to respond to that I think the fact the case times out October 25 I would think would resolve his concerns."

The court continued the trial to October 3, 2013, and scheduled another trial confirmation hearing on September 26, 2013. Defense counsel asked to waive the trial confirmation hearing because of a scheduling conflict. The court agreed. The deputy district attorney asked defense counsel to stipulate to the "time-out" date. Defense counsel agreed and stipulated that October 25, 2013 was the time-out date.

The court denied defendant's *Faretta* motion without further comment.

23.

**E. Defendant's Second *Marsden* Motion**

On September 27, 2013, the court convened a hearing based on defense counsel's advisement that defendant wanted to make a *Marsden* motion. Defendant stated the reasons for his motion:

> "It's a breakdown in the relationship, Your Honor. I don't—I'm not comfortable going to trial with him. I'm ready to go to trial, I just don't want to go with him. He's done a lot of talking to my family behind my back. He hasn't gotten the information that I wanted to get."

Defendant said he wanted "certified" transcripts prepared from the recordings of Desiree's MDIC interview and his interview with the police, and for the transcripts to be prepared by "a certified transcriber" with a "signature on the end of it saying that they, you know, they heard the recordings, and it's—it's true statements."

Defendant said he was not comfortable with Mr. Lambe because he had "close to a year and a half to work on my case, and he want[s] to come a week before a court date and ask me what do I want to do." Defendant complained Mr. Lambe should have something planned and "not sit there and wait for me to tell him" how to fight the case because "I've never been to trial before."

Defendant also complained that he had been in jail for seven months with "nothing going on." Defendant knew he faced a maximum of 16 years in prison, and Mr. Lambe discussed a "deal" for six years. Defendant refused the deal because he was not guilty.

Defendant was also upset that Mr. Lambe spoke to his brother and asked for permission to get some paperwork, but he did not know what that was about.

The court advised defendant that Mr. Lambe was very experienced and handled serious cases, and that he might have told defendant things he did not want to hear about the strength of the prosecution case. Defendant said Mr. Lambe discussed possible inconsistencies in the case, "but he still asks me what I want to do. I mean, if he's all that, and that's what he's gone through, I expect him to tell me how we can fight that, or

24.

how we can use that. He sits there and waits for me to tell him. I just—it don't make me feel comfortable."

Mr. Lambe advised the court that the public defender's office represented defendant until his first *Faretta* motion was granted. Defendant's family then paid $1,500 to a private investigator who claimed to have done some work, but later said he lost the work. Mr. Lambe said he began representing defendant in August 2012. He read defendant's statement to the police and believed he confessed to one count of violating section 288, and the victim's allegations carried a possible life sentence.

Mr. Lambe explained that he persuaded the district attorney to waive the preliminary hearing and "limit the charges to the charges then in effect carrying 16-year exposure," which prevented additional charges and a possible life sentence. Mr. Lambe said he had repeatedly explained to defendant his strategy "of waiving the prelim and barring the threat of a life sentence," but defendant still complained and acted like Mr. Lambe was "selling him down the river."

Mr. Lambe further explained that defendant claimed the victim's statements were misrepresented and inaccurately transcribed, but he had listened to the tape recording and was satisfied with the transcript. Mr. Lambe had advised the district attorney that the transcript from defendant's interview contained errors, but defendant's statements were not mischaracterized.

Mr. Lambe also explained that defendant's brother had repeatedly promised to send him a witness list and witness statements from the private investigator. Mr. Lambe never received the materials and called the brother to ask about it. In March 2013, defendant's brother told Lambe that defendant said not to give him anything, and hung up on him.

Mr. Lambe said he had seven jail interviews with defendant over 13 months. He last met with defendant on August 23 and September 26, 2013. Defendant disagreed with his proposed strategy to admit the offense he had confessed to during his pretrial

25.

interviews with the police. Defendant walked out of both meetings and refused to talk to him.

The court denied defendant's *Marsden* motion and set the trial for October 3, 2013. Defendant never renewed his request to represent himself.

## F. Additional Continuances

On October 3, 2013, the court granted the prosecution's motion for a continuance and trailed the trial to October 9, 2013. On October 9, 2013, both the prosecutor and defense counsel requested a further continuance. The court granted the motion and continued the trial to October 15, 2013. On October 15, 16, and 17, 2013, the court was forced to trail the matter because of courtroom unavailability.

On October 23, 2013, defendant's jury trial began.

## G. Timeliness

As explained above, a defendant's right to self-representation is absolute only if he or she invokes the right within a reasonable time prior to the start of trial. (*Williams, supra,* 56 Cal.4th at p. 193.) In *People v. Lynch* (2010) 50 Cal.4th 693 (*Lynch*) (abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610), the California Supreme Court extensively discussed the timeliness requirement. "[W]e have long held that a self-representation motion may be denied if untimely. [Citation.] Under [*People v. Windham* (1977) 19 Cal.3d 121], a motion is timely if made 'a reasonable time prior to the commencement of trial.' [Citation.] '[O]nce a defendant has chosen to proceed to trial represented by counsel,' a defendant's motion for self-representation is 'addressed to the sound discretion of the court.' [Citation.] We observed that our imposition of a timeliness 'requirement should not be and, indeed, must not be used as a means of limiting a defendant's *constitutional* right of self-representation.' [Citation.] Rather, the purpose of the requirement is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' [Citation.]" (*Lynch*, *supra*, 50 Cal.4th at p. 722, italics in original, fn. omitted.)

26.

"The high court has observed that lower courts generally require a self-representation motion to be timely, a limitation that reflects that 'the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.' [Citation.] Despite this tacit approval of the timeliness limitation on the self-representation right, the high court has never delineated when a motion may be denied as untimely. Nor has this court fixed any definitive time before trial at which a motion for self-representation is considered untimely, or articulated factors a trial court may consider in determining whether a self-representation motion was filed a reasonable time before trial." (*Lynch*, *supra*, 50 Cal.4th at p. 722.)

"Along these lines, we have held on numerous occasions that *Faretta* motions made on the eve of trial are untimely…." (*Lynch*, *supra*, 50 Cal.4th at p. 722.) "Likewise, we have concluded that motions for self-representation made long before trial were timely. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 434 … [*Faretta* motion made seven months before penalty retrial jury selection commenced was timely]; *People v. Stanley*[, *supra*,] 39 Cal.4th [at p.] 932… [self-representation motion made one year before the preliminary hearing and nearly two years before trial was timely].)" (*Lynch*, *supra*, 50 Cal.4th at p. 723, fn. omitted.)

"Nevertheless, our refusal to identify a single point in time at which a self-representation motion filed before trial is untimely indicates that *outside these two extreme time periods, pertinent considerations may extend beyond a mere counting of the days between the motion and the scheduled trial date*." (*Lynch*, *supra*, 50 Cal.4th at p. 723, italics added.)

"[*T*]*imeliness for purposes of Faretta is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made*. An analysis based on these considerations is in accord with the purpose of the timeliness requirement, which is 'to

27.

prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' [Citation.]" (*Lynch*, *supra*, 50 Cal.4th at p. 724, italics added.)

"[T]he high court's cases and those of this court guide us to the conclusion that a trial court may consider the totality of the circumstances in determining whether a defendant's pretrial motion for self-representation is timely. Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Lynch*, *supra*, 50 Cal.4th at p. 726.)[10]

## H. Analysis

Defendant's first *Faretta* motion was granted on February 28, 2012. Thereafter, defendant requested and received several continuances. On August 1, 2012, when the pre-preliminary hearing was scheduled, defendant asked for reappointment of counsel. The court reappointed the public defender's office.

As of May 30, 2013, the trial was set for September 24, 2013. On September 19, 2013, on the eve of trial, defendant made his second *Faretta* motion. The court advised defendant of the imminent trial date and asked if he was ready to proceed to trial. Defendant replied, "I'll probably need *a couple more months.*" The stipulated time-out

---

**10** *Lynch* was a death penalty case that had been pending for nearly four years when the defendant requested to represent himself. The attorneys estimated a five- to seven-week guilt phase trial, and the defendant claimed he needed months to go through the evidence before he would even know how long a continuance he would need. *Lynch* held the defendant's *Faretta* motion was not timely, and the court did not abuse its discretion when it denied defendant's motion. (*Lynch, supra*, 50 Cal.4th at pp. 716–717, 726.)

28.

date was October 25, 2013, but there is no indication defendant was willing to further waive time.  (Italics added.)

Defendant complains that the court denied defendant's *Faretta* motion without giving reasons.  "Even when the trial court does not state it is denying a *Faretta* motion on the ground of untimeliness, we independently review the record to determine whether the motion would properly have been denied on this ground. [Citation.]"  (*People v. Halvorsen, supra,* 42 Cal.4th at p. 433, fn. 15.)  In evaluating a trial court's denial of an untimely *Faretta* motion, " 'a reviewing court must give "considerable weight" to the court's exercise of discretion and must examine the total circumstances confronting the court when the decision is made.' [Citation.]"  (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1353.)

The court did not expressly state it was denying defendant's *Faretta* motion because it was untimely.  However, the entirety of the court's remarks clearly indicate that the timeliness of the motion, and the implications from defendant's uncertain request that he would "probably need a couple of more months" in light of the imminent time-out date, were the primary concerns.

Defendant asserts the court abused its discretion when it rejected his request for a continuance of 60 days.  Defendant notes the trial did not begin for 35 days, with motions in limine heard on October 23, 2013, and opening statements and testimony began on October 29, 2013, 40 days after defendant's *Faretta* motion.  However, the court's determination of untimeliness "necessarily must be evaluated as of the date and circumstances under which the court made its ruling; a trial court's reasonable and proper determination that such a motion is untimely does not become erroneous simply because, for example, an imminent trial ultimately is postponed…."  (*People v. Marshall* (1997) 15 Cal.4th 1, 24–25, fn. 2.)

Defendant had previously represented himself for six months.  After he requested reappointment of counsel, his attorney waived the preliminary hearing and there were no

further developments in the case prior to trial. Defendant did not offer any specific reasons why he still needed at least a couple of months or more to prepare, and the time-out date was imminent. While the majority of witnesses were law enforcement and investigative personnel, the chief witness against him was an 11-year-old girl who was the alleged sexual molestation victim. The court did not abuse its discretion by denying the *Faretta* motion as untimely.

Finally, even assuming the court erroneously denied his untimely *Faretta* motion, such a decision is reviewed under the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Rogers* (1995) 37 Cal.App.4th 1053, 1058.) In considering whether it is reasonably probable that a result more favorable to the defendant would have been achieved in the absence of the claimed error, we cannot ignore that a defendant who represents himself or herself rarely, if ever, could achieve a better result than competent counsel could obtain. (See, e.g., *Faretta, supra,* 422 U.S. at p. 834 ["It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts."]; *People v. Rivers* (1993) 20 Cal.App.4th 1040, 1051 ["It is candidly recognized that a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel"]; *Martinez v. Court of Appeal* (2000) 528 U.S. 152, 161 ["[o]ur experience has taught us that 'a pro se defense is usually a bad defense, particularly when compared to a defense provided by an experienced criminal defense attorney.' "].)

The evidence against defendant was compelling, and he confessed to sexual contact with Desiree in both his pretrial interviews. In the face of his admissions, defense counsel vigorously attacked the inconsistencies in Desiree's multiple statements about the molestations. This strategy was somewhat hampered by defendant's letter to his daughter, Tanisha, where he promised millions of dollars if she could get Desiree and her

mother to recant their accusations.[11] As a result of defense counsel's efforts, defendant was convicted of one count but found not guilty of the other two charges. Under these circumstances, we see no reason to believe that defendant could have mounted a stronger defense at trial by becoming his own attorney. Any error in denying defendant's untimely request for self-representation was therefore harmless.

## II.  The Expert Witness's Testimony

As set forth in the factual statement, Dr. Robinson testified as a prosecution expert on CSAAS. Defendant does not challenge Dr. Robinson's testimony on CSAAS. Instead, defendant contends that Dr. Robinson went beyond the scope of expert testimony and vouched for the credibility of Desiree and the truthfulness of her allegations. Defendant contends the court erroneously overruled his repeated objections to this testimony, and the error was prejudicial and requires reversal.

We will review the procedural history of this case which led to Dr. Robinson's challenged testimony, and find the court erroneously overruled defendant's objections but the error is not prejudicial under the circumstances of this case.

### A.  Pretrial Motions

During pretrial motions, the court and the parties addressed the prospective testimony of Dr. Robinson on CSAAS. Defense counsel stated he did not generally object to CSAAS evidence, but he was more concerned about Dr. Robinson.

---

[11] "[S]ubsequent events and circumstances may shed light on the question whether a defendant's interjection of a brief and impulsive request to proceed pro se actually represents a knowing, voluntary, and unequivocal request for self-representation or instead a temporary reaction to an adverse circumstance." (*People v. Marshall*, *supra*, 15 Cal.4th at pp. 24–25, fn. 2.) Tanisha's trial testimony about this letter might explain the timing of defendant's second *Faretta* motion, his vague request for a continuance of "probably" a couple of more months, and his subsequent *Marsden* motion. She received the letter in the summer of 2013, and defendant claimed he would receive millions of dollars upon his release from jail, directed her to contact Desiree and her mother to obtain a recantation, and to surreptitiously report back to him as soon as possible. The record suggests defendant did not get the response he desired.

"I have had Dr. Robinson on three trials, and on the second and third trials, I found her to be pretty outrageous and attempted to repeatedly go way beyond the permissible use of child sexual abuse accommodation syndrome. She has attempted to tell the jury, with some degree of success, *that children don't lie, that she's an experienced therapist, and that children are honest about these things and so on*. And the substance of this is that she attempts to go way beyond [CSAAS]. She does not want to give responsive answers to questions. She wants to give a speech every time she is asked a simple question. She is a real handful as a witness and doesn't, in my opinion, play by the rules a witness should follow." (Italics added.)

The court replied that Dr. Robinson would "play by the rules here," and invited appropriate objections. The court advised the prosecutor: "[W]e are not here to play games, and if I have to state that to Dr. Robinson in front of the jurors, I will do so. There's too much at stake. So I would encourage you to advise the doctor to answer questions asked and only questions asked." The court reiterated that "[i]t's not going to happen."

The prosecutor replied that he had done one trial with Dr. Robinson and did not encounter any problems. Defense counsel said his first experience with Dr. Robinson was uneventful, but "the second [was] quite eventful in my mind." The court again said that "this one will be uneventful as well … because the Court is not going to tolerate it."

**B. <u>Direct Examination and Initial Cautionary Instruction</u>**

We have already summarized Dr. Robinson's testimony in the factual statement. Of particular note, Dr. Robinson testified it was very important that the person who interviewed children who were victims of sexual abuse not ask leading questions "because children want to give answers that will please the interrogator. But a child then feels further overwhelmed. And sometimes children retract their report because they are just being retraumatized by the whole process of trying to talk about something that they don't even understand."

At the conclusion of her direct examination, the court instructed the jury:

"Dr. Robinson's testimony is not intended and should not be used to determine whether the alleged victim's molestation claim is true. The

32.

evidence is inadmissible solely for the purpose of showing that the alleged victim's reactions as demonstrated by the evidence are not inconsistent with having been molested.  [¶]  You will be further instructed on how you may view this evidence at the conclusion of trial."

## C. **Cross-examination**

On cross-examination, defense counsel asked Dr. Robinson about the CSAAS factors, and the implications which arise from an alleged victim's inconsistent statements about sexual abuse.

"Q.   [T]he fact that stories conflict doesn't prove that the youngster is lying, does it?

"A.   Correct.

"Q.   And the fact that their stories conflict doesn't prove that they're telling the truth, right?

"A.   I think I'm confused by your word 'conflict."  The child's report can be inconsistent.

"Q.   I think inconsistent would be a better word.  All right.  So the fact that their stories are inconsistent doesn't prove that they're lying?

"A.   Correct.

"Q.   And the fact that their stories are inconsistent doesn't prove that they're lying?

"A.   Correct.

"Q.   And the fact that their stories are inconsistent doesn't prove that they're telling the truth.

"A.   *I guess my hesitation is I don't know why a child would be talking about something that wasn't the truth*.

"Q.   So your answer is that it does prove they're telling the truth?

"A.   No.

"Q.   So it doesn't prove they're telling the truth?

"A.   I think the question was confusing to me."

33.

Defense counsel tried to rephrase his question:

"Q.     Okay.  The fact that they delay reporting doesn't prove that they're lying?

"A.     Correct.

"Q.     The fact that they delay reporting doesn't prove that they're telling the truth?

"A.     Again, that's just a confusing question.  A child doesn't talk about something like this because there's nothing else in the world to talk about.  *A child talks about this because something has happened.*

"Q.     So in your view, it does prove they're telling the truth?  Or it doesn't prove they're telling the truth?

"A.     When a child talks about having been molested—

"Q.     It does prove they're telling the truth or it doesn't prove they're telling the truth?"

The court interrupted and asked defense counsel to wait.  Counsel replied that he wanted an answer but Dr. Robinson "wants to give a speech, I think."  The prosecutor objected.  The court directed Dr. Robinson to continue, and she said:  "You're asking me to say yes or no to words that don't make sense to me."

The court directed defense counsel to continue:

"Q.     The fact that an accuser retracts her accusation doesn't prove that she's lying?

"A.     Correct.

"Q.     The fact that an accuser retracts her accusation doesn't prove that she's telling the truth?

"A.     Every time you get to this question, the words make no sense to me, prove and accuser.

"Q.     Uh-huh.  So your answer is that the words make no sense to you?

"A.     The questions don't make sense to me.

34.

"Q. The questions don't make sense to you?

"A. Correct."

On further cross-examination, Dr. Robinson testified she had not reviewed any police reports about the charges, she had not interviewed or met Desiree, and she had not talked to anyone involved in the case.

## D. Redirect Examination

The prosecutor asked Dr. Robinson, "So would it then surprise you, based on your experience, for a child to be willfully dishonest that would cause the breakup of her family unit?" Defense counsel objected because the question was not about CSAAS. The court sustained the objection.

The prosecutor asked Dr. Robinson: "In our experience, will children potentially be dishonest about things that make them look good?" She said yes. Defense counsel's objection was sustained.

The prosecutor asked Dr. Robinson: "[H]ave you in the course of your experience and training acquired information about children and reasons for being truthful as well as not truthful?" Defense counsel again objected as beyond the scope of CSAAS. The court sustained the objection, and advised the prosecutor that the question exceeded the scope of CSAAS, but allowed him to proceed if he was trying to establish a foundation.

The prosecutor repeated the question, and defense counsel objected pursuant to Evidence Code section 352 and beyond the scope of cross-examination. The court instructed Dr. Robinson to answer and she replied:

> "My difficulty with those questions was that overwhelmingly in my experience … that overwhelmingly throughout my career, and in all my continuing education and consultation with colleagues, other clinicians, *children don't lie* about [sexual abuse]. They lie about things that make them look good, not things about which they fell shame and guilt." (Italics added.)

Defense counsel objected and moved to strike the answer. The court overruled the objection and instructed the jury:

"This witness in the course of her testimony has made it very clear that she has not interviewed any of the individuals in this particular case. This witness is basing it upon her experience and apparently discussions with others. [¶] But, again, Ladies and Gentlemen, I will repeat this instruction to you. *This witness's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. The evidence is admissible solely for the purpose of showing that the—I should say the alleged victim's reactions as demonstrated by the evidence are not inconsistent with having been molested.*" (Italics added.)

## E. Re-cross Examination

Defense counsel asked Dr. Robinson about her treatment of child molestation victims in her private practice.

"Q.     When they come to you, it's already clear that they've been molested, isn't it?

"A.  Yes.

"Q.     The people that you treat are actual victims, yes?

"A.     Yes.

"Q.     You don't treat people who are making up things, do you?

"A.     No."

## F. Defense Counsel's Objections

After Dr. Robinson's testimony, the jury was excused and defense counsel objected to her testimony.

"[DEFENSE COUNSEL]:  The witness was determined to go in the direction of, based on my training and experience, if a child makes an accusation of child molest, it is true because children only make up stuff that makes them look good and this doesn't make them look good. And that is—I know the Court had appreciated that that was beyond the child sexual abuse accommodation syndrome, but it is also [Evidence Code section] 352 because the witness is basically saying if the accusation is made, it must be true. That's in substance what her final testimony was.

"THE COURT:  But the reason the Court allowed the testimony … because it was a way of her explaining why she had difficulty answering your questions. Now, again, that is her opinion. And the jurors are going

to be instructed that they need not accept an expert's opinion. And they have already been instructed on the very limited aspects of what she has said, how it may be used in this case. And they will be instructed again.

"[DEFENSE COUNSEL]: If I may, Your Honor, she did not have difficulty understanding the questions, she just didn't like them because they're inconsistent with her world view. Her world view is that whatever the children say is proof that they're telling the truth and that the children are always telling the truth. [¶] It would be like a police officer coming in, taking the witness stand and saying, I've been a police officer for 20 years and I've interviewed a lot of suspects, and when they say they're innocent, my experience is that they're always being untruthful. We would never tolerate that from a police officer from the witness stand. And a police officer is no better or worse than a psychologist in determining whether people are truthful or not. [¶] She essentially has converted herself into a human lie detector. If a child says it, it must be true. That is what she testified to. It is outrageous, and that is why it is more prejudicial than probative.

"THE COURT: But the jurors also heard very pointed cross-examination by very able counsel—

"[DEFENSE COUNSEL]: Not able enough, I'm afraid.

"THE COURT: --who pointed out the shortcomings of her view So, Counsel, I'm satisfied with the state of the record as it is, that this witness expressed opinions on the syndrome, was asked questions that she could not answer, for whatever reason. On [rebuttal], she was given a chance to try to explain those, her inability—inability to comprehend or unwillingness to answer those questions and then it was subject to cross-examination. It has been completely vetted as far as the Court is concerned. And the jurors, again, were instructed twice during the testimony and will be instructed again at the conclusion of the trial."

## G. Closing Arguments and Instruction

At the close of evidence, the court gave CALCRIM No. 1193 to the jury about Dr. Robinson's testimony.

"You have heard testimony from Dr. Randall Robinson regarding child sexual abuse accommodation syndrome. *Dr. Robinson's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charges against him.* You may consider this evidence only in deciding whether or not [Desiree's] conduct

37.

was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." (Italics added.)

In his closing argument, the prosecutor cited Dr. Robinson's testimony about CSAAS to explain Desiree's delayed report about the molestation, her uncertainty of when the molestations occurred, and her concerns about what would happen to her family if she disclosed the molestations. The prosecutor did not cite Dr. Robinson's testimony as vouching for Desiree's credibility.

Defense counsel advised the jury to "[b]eware" of Dr. Robinson's testimony about CSAAS and described her as "every inch the hired gun" and "more partisan" than the attorneys in the case. Defense counsel discussed the elements of CSAAS and that it showed that "just because those things are present in a case doesn't mean that the allegations are false, but it also doesn't mean that the allegations are true."

Defense counsel argued the jury was supposed to use CSAAS "so you don't automatically reject the testimony of a child who fits into that profile," but Dr. Robinson would not admit that the same factors might indicate the child was not telling the truth.

> "That's partisanship. That's a witness who doesn't want to play straight with you. That's a witness who's a hired gun and is determined to advocate relentlessly for the child. The child is always right … that's her viewpoint … that's an attitude that a therapist should have in therapy, but it's not an attitude that should be brought into a courtroom."

In rebuttal, the prosecutor disputed Dr. Robinson as a "hired gun" and that she explained the reasons for a child's delayed disclosure. The prosecutor argued the defense should have brought in evidence to counter Dr. Robinson's opinions.

## H. **Expert Testimony**

Expert testimony is admissible on any subject sufficiently beyond common experience such that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a); *People v. Brown* (2004) 33 Cal.4th 892, 905.) A trial court has broad discretion in deciding whether to admit or exclude expert testimony, and its decision will

not be reversed on appeal unless a manifest abuse of discretion is shown. (*People v. McDowell* (2012) 54 Cal.4th 395, 426; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299.)

"CSAAS cases involve expert testimony regarding the responses of a child molestation victim. Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, CSAAS testimony 'is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]' [Citation.]" (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001–1002; *People v. Brown*, *supra*, 33 Cal.4th at p. 906; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior....' [Citation.]" (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1301.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust. Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings. In the typical criminal case, however, it is the People's burden to identify the myth or misconception the evidence is designed to rebut. Where there is no danger of jury confusion, there is simply no need for the expert testimony. [Citation.]" (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.)

"[B]ecause of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such

evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*People v. Housley* (1992) 6 Cal.App.4th 947, 958–959.)

"CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience. [Citation.] The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker*, *supra*, 203 Cal.App.3d at p. 394, italics in original.) Thus, CSAAS evidence may not be used to show that the molestation occurred or that the alleged victim's molestation claims are true. (*People v. Housley*, *supra*, 6 Cal.App.4th at p. 957.) "It is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred. It can be highly prejudicial if not properly handled by the trial court…." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.)

Moreover, an expert "is not allowed to give an opinion on whether a witness is telling the truth because the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact. [Citations.]" (*People v. Long* (2005) 126 Cal.App.4th 865, 871; see also *People v. Sergill* (1982) 138 Cal.App.3d 34, 39–40 [lay opinion about the veracity of a witness is inadmissible].)

In *People v. Coffman and Marlow* (2004) 34 Cal.4th 1 (*Coffman*), the court addressed a situation where a defense expert testified about the veracity of a codefendant's claims of abuse. Coffman and her boyfriend, Marlow, were convicted of murder, kidnapping, and robbery. Coffman claimed Marlow was physically abusive toward her, and she participated in the crimes because she was afraid he would harm her

or her son.  Dr. Walker, a psychologist, testified as a defense witness for Coffman about battered women's syndrome.  (*Id*. at p. 20)  In the course of her testimony, Dr. Walker repeatedly said that in her professional opinion, Coffman's account of Marlow's coercion and threats against her was truthful, and Coffman lacked the intent to kill.  (*Id*. at pp. 81–82.)

On appeal, Marlow claimed defense counsel was prejudicially ineffective for failing to object to Dr. Walker's testimony about Coffman's alleged truthfulness, and Dr. Walker's testimony was prejudicial to his own defense.  (*Coffman*, *supra*, 34 Cal.4th at p. 81.)  The California Supreme Court agreed that Dr. Walker's testimony should have been excluded:

> "On the merits, the challenged opinion that Coffman was credible should have been excluded on a proper objection.  The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful.  [Citations.]  Thus, we have held that a psychological expert may not testify about rape trauma syndrome, a condition analogous to battered woman syndrome, in order to prove that a rape actually occurred, although such testimony is admissible to rehabilitate the credibility of the complaining witness against a suggestion that her behavior after the assault—such as a delay in reporting it—was inconsistent with her claim of having been raped.  [Citations.]  On a number of occasions in the present case, rather than merely explaining, with reference to her expert knowledge, certain aspects of Coffman's behavior that a layperson might find irreconcilable with her claim to have been battered, Dr. Walker testified she believed Coffman's claims of abuse and domination by Marlow were true.  To this extent, a timely and specific objection probably should have been sustained."  (*Id*. at p. 82, fn. omitted.)

*Coffman* held the error was not prejudicial to Marlow because Dr. Walker never vouched for the credibility of Coffman's testimony about Marlow's actual commission of the charged crimes.  In addition, the court gave the jury the appropriate cautionary instructions about an expert's opinion, and specifically instructed the jury that it could

41.

consider Dr. Walker's testimony about battered woman's syndrome only to evaluate Coffman's defense about her mental state.  (*Coffman*, *supra*, 34 Cal.4th at pp. 82−83.)

## I.  Analysis

In this case, Dr. Robinson's testimony about CSAAS was relevant, probative, and admissible given Desiree's delayed report about the molestations, the inconsistencies between some of her statements, and the defense's attempts to undermine Desiree's motive and credibility in making the reports.

As noted by defendant, however, Dr. Robinson's testimony went beyond the scope of CSAAS.  On cross-examination, defense counsel sought to demonstrate that the CSAAS factors were equally indicative that the child may not be telling the truth.  Dr. Robinson repeatedly told defense counsel that she did not understand his question, and then volunteered "I guess my hesitation is *I don't know why a child would be talking about something that wasn't the truth*."  On redirect examination, the prosecutor tried to clarify whether the CSAAS factors were indicative of the child being truthful.  Defense counsel repeatedly objected.  The prosecutor asked Dr. Robinson:  "In our experience, will children potentially be dishonest about things that make them look good?"  She said yes.  After additional objections, the court allowed the prosecutor's questions to establish a foundation, and permitted Dr. Robinson to respond, and she said that in her experience "*children don't lie* about [sexual abuse].  *They lie about things that make them look good, not things about which they feel shame and guilt.*"  (Italics added.)

While Dr. Robinson's testimony about CSAAS may have been admissible, the trial court should have granted defense counsel's repeated objections and requests to strike Dr. Robinson's testimony that went beyond the scope and addressed the truthfulness of children who report sexual abuse.  Dr. Robinson was essentially allowed to testify that a child would not lie about being sexually molested.  While Dr. Robinson had not read any investigative reports or interviewed Desiree, she was testifying as an expert to explain CSAAS and the reasons why a child would not immediately report

42.

being sexually molested.  Dr. Robinson did not personally vouch for Desiree's credibility, but testified to her experience that children don't lie about these types of situations.

As in *Coffman*, however, the court's evidentiary error is not prejudicial under the circumstances.  Desiree testified in front of the jury and was subject to extensive cross-examination about inconsistencies in her prior statements.  Desiree's primary pretrial interview was tape-recorded and the jury was able to watch the interview techniques used during that session.  Defendant's postarrest interview was also tape-recorded, and he admitted engaging in certain sexual touching of Desiree.

In addition, defense counsel was still able to undermine Dr. Robinson's testimony even though the court overruled his objections.  Dr. Robinson admitted she had not interviewed Desiree or read any of the investigative reports about this case.  Counsel also brought out that Dr. Robinson's private practice was limited to certain types of child patients, and established that her opinions were likely based on her experience of treating children who had actually been abused.

Defense counsel also effectively attacked Dr. Robinson's credibility in closing argument, by reminding the jury that Dr. Robinson did not want to admit that the CSAAS factors were equally indicative that the child may not be truthful.  The prosecutor responded by asserting that the defense could have called an expert to refute Dr. Robinson's testimony about CSAAS, but the prosecutor did not assert that Dr. Robinson had vouched for Desiree's credibility.

The court clearly instructed the jury about the limited admissibility of Dr. Robinson's testimony, and repeated this instruction before, during, and after her testimony.

Finally, the entirety of the record refutes any inference that the jury may have interpreted Dr. Robinson's testimony as vouching for Desiree's credibility.  Defendant was charged with count I, continuous sexual abuse of Desiree, on or about August 1,

43.

2010 through September 20, 2011; count II, commission of a lewd or lascivious act on Desiree, on or about August 1, 2010, through January 1, 2011; and count III, commission of a lewd or lascivious act on Desiree, on or about September 1 through 20, 2011. The jury found him guilty of count I. He was found not guilty of counts II and III, even though Desiree's trial testimony arguably supported those charges. The jury's verdicts indicates that it carefully considered the charged offenses and the evidence, and it was not influenced by Dr. Robinson's alleged blanket vouching for an alleged child molestation victim.

## **DISPOSITION**

The judgment is affirmed.

_____

POOCHIGIAN, J.

WE CONCUR:

_____

LEVY, Acting P.J.

_____

DETJEN, J.

44.